Filed 8/4/14  P. v. Dill CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E058870 |
| v. | (Super.Ct.No. RIF087936) |
| LEROY DILL, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Becky Dugan, Judge.

Affirmed.

Sylvia Whatley Beckham, under appointment by the Court of Appeal, for

Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Warren

Williams, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant and appellant Leroy Dill was sentenced to an indeterminate life term as a third striker for offenses committed in 1999. After passage of the Three Strikes Reform Act (Reform Act) in November 2012, defendant filed a petition to recall the sentence and for resentencing pursuant to Penal Code section 1170.126. The trial court found defendant eligible to apply for resentencing, but denied defendant's petition on the merits, finding that defendant posed an unreasonable risk of danger to the public. Defendant appeals, contending that the trial court applied the wrong standard, misallocated the burden of proof, considered improper matters, and otherwise abused its discretion in denying his petition. We affirm.

<u>FACTS AND PROCEDURAL HISTORY</u>

When defendant was 16 years old, he was adjudicated a ward of the court for robbery and aggravated assault when he participated with an armed accomplice in taking jewelry by force from a victim in the parking lot of a fast food restaurant. Defendant was then committed to the California Youth Authority (Youth Authority) for eight years, but was released after three or four years when he was 20 years old.

In 1991, while defendant was still on parole after his release from the Youth Authority, and before his 21st birthday, he committed another robbery. He and two accomplices robbed the clerk of a convenience store. One of the accomplices was armed with a knife. Defendant was sentenced to prison for three years.

2

Defendant was on parole in 1993 when he entered a shoe store with two accomplices; one of the accomplices was armed with a gun. Defendant helped herd the store employees into the back room. Defendant pushed one of the employees to the floor, and an accomplice threatened to kill the employees. Defendant assisted his companions by tying their hands with duct tape. Defendant and his accomplices emptied the cash register, tripping a silent alarm. Responding officers arrested defendant and his accomplices. Defendant was again convicted of robbery, and a finding was made that a principal was armed with a firearm in the commission of the offense. Defendant was sentenced to nine years in prison.

These three robbery offenses were alleged as strikes in 1999, when defendant was charged with new offenses. Defendant evidently had been paroled after his 1993 robbery conviction some time in 1998. In 1999, an incident occurred when a search warrant was executed while defendant was sitting in a car parked in front of his girlfriend's apartment. Defendant was detained while the search was being carried out. Defendant at first denied living in the apartment, but then admitted he stayed there sometimes. The searching officers found a bag of cocaine under some rocks near the front door of the apartment, more cocaine hidden in a bathroom vent, and some marijuana. They also found an unloaded handgun concealed in a sock and hidden in the attic crawl space in the bedroom closet.

Defendant was charged with being a felon in possession of a firearm, possession of cocaine base for sale, and possession of marijuana. Defendant pleaded guilty to the

misdemeanor charge of marijuana possession, and was tried on the remaining charges. The information also alleged two strike priors and two prior prison terms.

Defendant's girlfriend testified at trial that the cocaine base belonged to defendant, and that she had seen him selling cocaine outside the apartment. Defendant had told police at first that he knew nothing about the cocaine. Later, defendant said that some of his friends had sold cocaine, but he still denied personal participation. Some of the officers testified that defendant admitted obtaining the gun for protection. Defendant's girlfriend testified at trial that defendant had brought the gun to the apartment, and he had told his girlfriend that he got it for protection. Defendant denied making any such admission, however, and claimed that he had never seen the gun before the officers found it on the night of the search. The jury acquitted defendant on the charge of possession of cocaine base for sale, but did convict him of unlawful possession of a firearm by an ex-felon. The trial court found true the prison term and strike allegations. In August 2000, the court sentenced defendant as a third striker to a term of 25 years to life for the possession of a firearm charge, plus two one-year terms for the prior prison term convictions, for a total term of 27 years to life.

In November 2012, the electorate passed Proposition 36, the Reform Act. The Reform Act permits certain persons sentenced as third strikers to petition for recall of the sentence and for resentencing as a second striker, when the third strike offense is not a serious or violent felony. (See Pen. Code, § 1170.126.) Defendant requested appointment of counsel to assist in filing a petition. A petition was duly filed on April

4

23, 2013. The People filed an opposition memorandum. The trial court heard defendant's petition on May 23, 2013. The court found that defendant was eligible for resentencing under the statute—i.e., he was not otherwise disqualified. The court denied defendant's petition, however, finding that defendant posed an unreasonable risk of danger to the public were he to be released.

Defendant filed a notice of appeal.

## ANALYSIS

### I. Standard of Review

The Reform Act amended the "Three Strikes" law to change the effect on sentencing if an offender's third strike offense is not a serious or violent felony. Under the former law, a recidivist offender who had two or more prior strikes, and who was convicted of any new felony, was subject to an indeterminate life sentence. The Reform Act changed the Three Strikes law so that a life sentence for a third strike would be imposed only where the current offense is a serious or violent (strike) felony or where the prosecution has pled and proved an enumerated disqualifying factor. In all other cases, the offender will now be sentenced as a second strike offender. (Pen. Code, §§ 667, 1170.12.) The Reform Act also created a proceeding for postconviction relief for prisoners who are serving an indeterminate life sentence imposed pursuant to the Three Strikes law for a crime that was not a serious or violent felony and who are subject to other disqualifying factors. Once a prisoner has met the requirements for eligibility for

resentencing under Penal Code section 1170.126, subdivision (e),[1] then the prisoner "shall be resentenced pursuant to paragraph (1) of subdivision (e) of Section 667 and paragraph (1) of subdivision (c) of Section 1170.12 unless the court, *in its discretion*, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." (Pen. Code, § 1170.126, subd. (f), italics added.)

In exercising its discretion, "the court may consider:

"(1) The petitioner's criminal conviction history, including the type of crimes committed, the extent of injury to victims, the length of prior prison commitments, and the remoteness of the crimes;

"(2) The petitioner's disciplinary record and record of rehabilitation while incarcerated; and

---

[1] Penal Code section 1170.126, subdivision (e), provides: "(e) An inmate is eligible for resentencing if:

"(1) The inmate is serving an indeterminate term of life imprisonment imposed pursuant to paragraph (2) of subdivision (e) of Section 667 or subdivision (c) of Section 1170.12 for a conviction of a felony or felonies that are not defined as serious and/or violent felonies by subdivision (c) of Section 667.5 or subdivision (c) of Section 1192.7.

"(2) The inmate's current sentence was not imposed for any of the offenses appearing in clauses (i) to (iii), inclusive, of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667 or clauses (i) to (iii), inclusive, of subparagraph (C) of paragraph (2) of subdivision (c) of Section 1170.12.

"(3) The inmate has no prior convictions for any of the offenses appearing in clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667 or clause (iv) of subparagraph (C) of paragraph (2) of subdivision (c) of Section 1170.12."

"(3) Any other evidence the court, within its discretion, determines to be relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety." (Pen. Code, § 1170.126, subd. (g).)

Review of the trial court's ruling on the petition involves more than one issue. In part, we are called upon to determine the meaning of Penal Code section 1170.126, particularly the provision that states: "the petitioner *shall be resentenced* . . . unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." (Pen. Code, § 1170.126, subd. (f), italics added.) We independently determine issues of law, such as the interpretation and construction of statutory language. (*People v. Love* (2005) 132 Cal.App.4th 276, 284.) The principles of statutory interpretation apply to voter initiatives, as well as to enactments of the legislature. (*Ramos v. Superior Court* (2007) 146 Cal.App.4th 719, 727.)

Beyond any issues of statutory interpretation, we are also called upon to review the trial court's discretionary ruling, finding that a new sentence would represent an unreasonable risk of danger to the public. We review the trial court's discretionary rulings for abuse of that discretion. When the standard of review is abuse of discretion, the reviewing court "examines the ruling of the trial court and asks whether it exceeds the bounds of reason or is arbitrary, whimsical or capricious. [Citations.] This standard involves abundant deference to the trial court's rulings." (*People v. Jackson* (2005) 128 Cal.App.4th 1009, 1018.)

II.  The Prosecution Bore the Burden of Establishing Dangerousness by a Preponderance of the Evidence

In *People v. Superior Court (Kaulick)* (2013) 215 Cal.App.4th 1279 (*Kaulick*), the Court of Appeal described the three-step process for considering petitions for resentencing under Penal Code section 1170.126.  "First, the court must determine whether the prisoner is [statutorily] eligible for resentencing; second, the court must determine whether resentencing would pose an unreasonable risk of danger to public safety; and third, if the prisoner is eligible and resentencing would not pose an unreasonable risk of danger, the court must actually resentence the prisoner."  (*Kaulick, supra,* at p. 1299, italics omitted.)

The *Kaulick* court also took note of the express language of Penal Code section 1170.126, subdivision (f), that an eligible petitioner "*shall be* resentenced" as a second striker, "unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety."  The parties in *Kaulick* agreed, as do we, that this language places a burden of proof on the prosecution to demonstrate dangerousness.  The *Kaulick* court further held that the appropriate standard of proof was by a preponderance of the evidence.  (*People v. Superior Court (Kaulick)*, *supra*, 215 Cal.App.4th 1279, 1305.)

Defendant points to various remarks of the trial court, and suggests that the remarks indicate that the trial court misallocated the burden of proof at the hearing, requiring defendant to demonstrate that he would not be dangerous, as opposed to the

8

prosecution's burden to show that resentencing would pose an unreasonable risk of dangerousness to the public. That is, the court stated at one point that it could not find, "even by a preponderance of the evidence, that I believe you'll remain law abiding." At another point, the court remarked that, even though defendant's relatives were supportive, "I don't believe they would keep you law abiding[;] they hadn't before."

These statements by the court did not, however, indicate that the court had allocated the burden of proof to defendant on the issue of dangerousness. From the beginning, the trial court properly focused on the issue: "whether [defendant] remains a danger to the community." The court was entitled to, and did, consider many aspects of defendant's past criminal behavior, his convicted prior offenses, his current conviction, and his conduct while in prison in assessing the question of his future dangerousness. Many of these factors were troubling on the issue of the risk of danger to the public. The court's statements simply expressed its assessment that it was more likely than not (preponderance standard) that defendant would continue to pose an unreasonable risk of danger to public safety.

The court is presumed to be aware of the applicable legal standards, and defendant has failed to rebut that presumption. The totality of the circumstances shows that the trial court had the proper issue and the proper considerations before it: whether the prosecution had shown by a preponderance of the evidence that defendant posed an unreasonable risk of danger to public safety.

III. <u>The Trial Court Did Not Abuse Its Discretion in Denying Defendant's Resentencing</u>

<u>Petition</u>

Defendant raises several evidentiary issues. Defendant contends that the trial court exhibited an arbitrary and irrational bias in some of its statements, that the court misinterpreted the evidence, that the court engaged in speculation about defendant's psychological status without expert evidence, and that the evidence was insufficient to support a finding that defendant posed an unreasonable risk of danger to public safety.

In addition to defendant's past criminal record, the trial court also received evidence of defendant's activities and disciplinary record while in prison.[2] Over the

---

[2] On the positive side of the ledger, after being incarcerated on his third robbery conviction in 1993, defendant earned some academic certificates (reading competency, language competency, and mathematics competency) in 1996. In 1997, he received a qualifying score on a test meeting the requirements of the Prisoner Literacy Act. The test scores also qualified defendant to earn a GED (high school equivalency) certificate.

Defendant was paroled in 1998, but was reincarcerated on his conviction for the 1999 three strikes offenses.

Thereafter, the record in defendant's central file, or "C-file," indicated many disciplinary incidents.

On November 29, 2001, defendant was charged with a rules violation for failure to comply with lockup procedures after meal time. Defendant pleaded not guilty, but was found guilty of a rules violation. A few days later, December 3, 2001, defendant did not come out of the housing unit for yard exercise time. Defendant became agitated and yelled at a corrections officer, threatening, "you better never come close to me." Defendant was handcuffed and removed. Defendant was charged the next day with threatening bodily harm to a peace officer. He pleaded not guilty, but was found guilty; the offense was reduced and defendant was punished with forfeiture of credits. He was, however, placed in administrative segregation following the incident.

In 2002, defendant pleaded guilty to a disciplinary charge of "delaying lock-up," when he refused to enter his cell at lockup. Defendant was disciplined with extra duty.

In 2004, defendant was found in possession of three gallons of "pruno," one-half gallon of syrup, and one-half gallon of jelly. He was disciplined for possession of manufactured alcohol. Defendant claimed he had only "juice" and "sugar," "not pruno."

*[footnote continued on next page]*

*[footnote continued from previous page]*
Nevertheless, he was found guilty and disciplined with forfeiture of credits and loss of privileges.

In 2005, defendant was disciplined for an incident involving possession of contraband. An inmate passed something under the door to defendant's cell. The officers shut down the water supply to both cells. The other inmate was searched. When defendant was ordered to come out of his cell, he ran across the day room to another cell and slid something under the door. The officers sounded the alarm and ordered the inmates in the day room to get down. Defendant was pepper-sprayed and handcuffed. Defendant admitted that he had some lighters, but did not want to let the officers take them from him. Defendant pleaded guilty to a disciplinary charge of resisting staff and using force. He was counseled, reprimanded, and advised of requirements for his behavior in the future.

In 2007, defendant and another inmate took part in a mutual combat on the basketball court. Initially, neither defendant nor the other inmate complied with orders to lie down. Defendant pleaded guilty to a disciplinary charge, and was punished with the loss of 60 days of credits and 10 days' loss of yard privileges.

In August 2009, defendant was the victim of a stabbing by another inmate. Defendant claimed that the incident was caused because a correctional officer falsely told some inmates with gang affiliations that defendant was a "snitch" on inmates with cell phones, drugs, or other contraband. The attack happened when defendant was surrounded by members of the Bloods gang and then stabbed. Defendant suffered cuts on his head. In October 2009, defendant filed a grievance, requesting $200,000 in damages for pain and suffering, and demanding an investigation into his charges that a guard had falsely portrayed him as a "snitch" to prison gang members. However, defendant refused to identify any inmates whom he alleged had heard what the guard said, and defendant was unaware of any staff member who could corroborate the statement. In the absence of any evidence and defendant's lack of cooperation, no action was taken on defendant's grievance and complaint.

In January 2010, the institution's classification committee adjusted defendant's housing classification, because he had not had any serious rules violations in the past six months. As a result of the adjustment, defendant could be placed in a two-person cell. An "annual review" report of the same date (Jan. 13, 2010) indicated that, "no factors evident which would jeopardize safety or security of the institution."

In November 2010, defendant was initially written up for "battery on a peace officer," when he allegedly pushed a correctional officer in the chest with his shoulder. The offense was reduced below an "administrative" violation, however, and by a memorandum in December 2010, the violation was ordered removed from defendant's record, including removal of the referral and notice of rules violation. Evidently, the instructions in the memorandum were not carried out, because papers referring to the violation remained in defendant's central file.

*[footnote continued on next page]*

*[footnote continued from previous page]*

In March 2011, defendant's housing assignment was reviewed by the institution's classification committee. Defendant was having a conflict with another inmate, and also with one of the guards; defendant had been placed in the Administrative Segregation Unit and assigned to a different "special needs yard." However, defendant was eventually returned to his original special needs yard when the other inmate was transferred to a different yard, and the officer no longer worked in the unit where defendant was housed.

In May 2011, defendant had a positive drug test. He pleaded not guilty to the rules violation, but was found guilty of possession of a controlled substance. He was disciplined with forfeiture of credits and loss of privileges.

In December 2011, defendant was written up twice for fighting with other inmates. On December 10, 2011, defendant engaged in a mutual combat with another inmate on the basketball court. Defendant denied punching anyone, but was found guilty of fighting and disciplined with forfeiture of credits and 30 days' loss of yard privileges.

On December 26, 2011, defendant was fighting with a different inmate in the day room. Defendant failed to comply with orders to get down, and even moved toward the other inmate as officers were approaching. Defendant was subdued with pepper spray. Defendant was again found guilty of fighting. He was reprimanded and counseled about expectations for his future behavior.

In another notation in December 2011, defendant was identified as a member of the Men's Advisory Council, with some extended privileges to be out of his cell when on council business.

One day in July 2012, defendant refused to go back to his cell after the morning meal. Defendant complained that he had been asking to be moved away from his current cellmate. Defendant was reminded of the proper procedures to request a bed move. In August 2012, a memorandum was issued concerning the July incident; the disciplinary offense was reduced from "delaying an officer" to "misconduct," and rated below the "administrative classification" level. The memorandum ordered the disciplinary report and other written reports to be removed from defendant's central file.

In November 2012, defendant was found in possession of tobacco, a contraband substance in the facility. Defendant refused to attend the disciplinary hearing. A plea of not guilty was entered for him in absentia, but defendant was found guilty of possession of contraband. He was disciplined with forfeiture of 60 days of credits, and with 90 days' loss of day room, telephone and yard privileges.

In December 2012, defendant was fighting with another inmate outside the culinary building. Neither inmate initially complied with orders to lie down. Both were pepper-sprayed and taken into custody. Defendant refused to attend the disciplinary hearing. A not guilty plea was entered for him. At the hearing, defendant was found guilty of fighting and disciplined with forfeiture of 90 days of credits, and 30 days' loss of day room, telephone, and yard privileges.

years, defendant was involved in a fair number of disciplinary infractions, including a number of incidents of threats, forcible resistance, mutual combat with other inmates, and other flare-ups of violence, in addition to other rules violations.

Defendant testified at the hearing that he had been in only four mutual combat fights, all of which he claimed happened because he had renounced his former street gang membership and had refused to participate in "prison politics." Defendant said he has been in protective custody since 2009. Defendant told the court that he was sorry for his past crimes. He said, "I made childish, stupid decisions." Defendant said that, if he could apologize to his victims face to face, he would do so. On questioning by the court, however, defendant admitted that, in the several years following his crimes, he never thought of writing a letter to any of his victims. Defendant stated that he realized he had "screwed [his] life up" by choosing the wrong people to associate with, and engaging in "stupid" behaviors. Defendant said that he was a changed man, and that he was trying to obtain whatever education was available to him, and worked different prison jobs that were offered. He had worked in both landscaping and culinary positions. Some positions or programs were unavailable to him because of his life sentence. Defendant admitted that, when not imprisoned, he had never been employed, except for a short stint as a roofing trainee while he was living in a halfway house. The longest defendant had ever been out of custody was 15 to 16 months.

Some of defendant's family members attended the hearing. Defendant's aunt testified about defendant's difficult childhood and his removal from his mother's custody

at an early age.  Defendant's home life was unstable and he went back and forth between various relatives from ages five to 16.  The aunt stated that she could now provide him some stability if he were released; she had not been able to be part of his life before, because she did not drive.  She had talked to defendant by telephone about five or six times in the past five years.

Defendant's uncle testified that he had spoken to defendant approximately 15 times in the past five years.  The uncle was unable to take defendant away from his environment when defendant was a teenager, because of time and distance constraints.  Defendant was living and going to school in Los Angeles; the uncle and his family lived in Moreno Valley, so defendant's commute to his vocational school would have been difficult.  The uncle had also then been preoccupied with his own children.  The uncle felt that, if defendant had been allowed to live with him earlier, defendant would not have gotten into trouble.  The prosecutor pointed out, however, that defendant's family members lied on the stand at the trial in defendant's present commitment offense, in support of defendant's claim at trial that he in fact did not possess or know about the gun in his girlfriend's apartment.

At the conclusion of the hearing, the trial court stated:  "You know, these cases are very hard. . . .  [¶] . . . [O]n a human level, it's just very difficult.  Nobody gives us a crystal ball.  Nobody tells us, well, is Mr. Dill going to go out and re-offend like [the prosecutor] says, or is he going to be law abiding like he says he'll be?

14

"I can only look at not the words, but the behavior. I can only look at not only your history, . . . but how you have been going along. And I believe that a lot of your fights in prison may come from your trying to get out of the gang lifestyle. I can believe that. But I don't believe that you've really had any insight. I think you view yourself as a victim. I think you view your family as a victim of your behavior.

"But when you, as a child, 16 is a child, you get eight years for a horrible crime, and [the California Youth Authority] isn't a picnic . . . . You get out of there, you had a chance to do programming. You had a chance to do school, you're in school. You have a supportive family. One side is probably not functioning as well as it should, but there are people in your family who are functioning.

"You throw that away, and you do another two years as an adult, and then you throw that away and you do another nine years as an adult. And out just a minute and a half [*sic*], you're back with a gun . . . . And you know enough to hide it. And then you claim, 'I was hanging out with that girl.' We know that is not true. You knew enough to hide it in there. You knew enough to . . . tell the police you had it because you were—then, same story you are giving me now—trying to stay away from those gangs.

"So, Mr. Dill, the bottom line is, as hard as it is, as much as I believe you talk the talk, I don't believe you have learned to walk the walk. And I know your family wants . . . to give you another chance, but I'm with [the prosecutor] on this one. I can't say to myself, even by a preponderance of the evidence, that I believe you'll remain law abiding.

15

"It's so overwhelmingly difficult for you. You have little insight. You're 43 years old. You have never worked a job . . . . You have never completed school, although you did complete your GED your second stint in state prison which says you could do that. [¶] You have had opportunities to do right. You have had a family that would help you do right and you chose not to. So I'm going to deny your petition. I'm sorry for your family because they've paid already all these years. But they don't know you, they couldn't possibly know you. As supportive as they are, I don't believe they would keep you law abiding, they hadn't before."

Defendant seizes on some of these and others of the court's remarks, arguing that the court improperly placed a burden on defendant to prove by a preponderance of the evidence that he would remain law abiding, rather than placing the burden on the prosecution to show by a preponderance of the evidence that there remained a substantial risk of danger to the public if defendant were adjudged eligible for eventual release.

The entire context of the court's remarks, in light of the evidence on the record, supports the trial court's denial of defendant's petition.

Defendant's juvenile adjudications and strike offenses involved weapons and threats of violence in the commission of a number of robberies. Defendant failed at each opportunity in the past to learn from his mistakes. After each release from custody, he soon reoffended in much the same way, acting in concert with others to rob while armed with weapons. Defendant was an active participant in the latest strike offense, binding the victims with duct tape, personally taking their jewelry from their persons, and

16

threatening them. Defendant committed each new offense while he was on active parole from his previous offense. In the latest commitment offense, defendant still had not learned his lesson: he armed himself with a gun.

Despite defendant's claims that he got the gun for protection from other gang members, because he was leaving his former gang, he selected a violent means of potential "protection." Defendant, as the court pointed out, knew enough to hide the gun, as he was well aware that he was not allowed to possess it. At the scene of the search, defendant admitted to police that the gun was his. At the trial, however, defendant recanted that stance, instead claiming that he knew nothing about the gun or its presence in the apartment; defendant accused the officers of lying about his statement. In support of the defense theory, defendant presented the testimony of "supportive" family members, i.e., false testimony to support defendant's narrative that the police were lying. That is, defendant's father testified at the trial, claiming to have been in a position immediately outside the apartment windows to observe the search and to hear the officers' conversation with defendant, so that he knew that defendant never stated that the gun was his. The father's testimony was impeached; the officers testified that they established a perimeter around the building while the warrant search was conducted, so that defendant's father could not have been in a position to see and hear the matters he claimed to have seen and heard. As the prosecutor expressed it at the resentencing hearing, "the whole case was basically Mr. Dill was framed by the police and we have his family here to support that claim." Even at the hearing on the present petition to recall

17

the sentence, defendant maintained that the gun was not his, and blamed his predicament on being involved with the girlfriend: "I shouldn't have been in that house. I was messing with the girl. The girl was up in there, and I wasn't trying to do anything with that gun . . . . And maybe that is my mistake for messing with this girl at the wrong place at the wrong time. I wasn't trying to have that gun or do anything." On this occasion, however, defendant did at least admit that he knew the gun was in the apartment.

The court summarized the offense as follows: "[H]e had this strike and it was a really bad offense and he got punished for it. What did he do after? He did it again. And he did it again. And now, this case which makes him eligible, it's not a violent crime, he's got a gun. He . . . tells the police the truth when he's first caught. I think he tells them the truth completely, 'Yes, it's my marijuana. Yes, it's my gun. I had it for protection from gangs. I know I shouldn't have it, yes, it's mine.' That's what he tells the police. [¶] By the time he testifies, they're liars. His family testifies they're liars. And he never cops to it, even today, . . . when he has no reason to fabricate, none, zero, he's begging for his life. 'That wasn't my gun, your Honor. I knew it was up in the attic, but that wasn't mine. My only mistake is being in the wrong place at the wrong time, hanging out with this girl.'"

As to defendant's prison conduct record, he had a few positive entries for educational achievement, all of which occurred before the present commitment offense. Otherwise, defendant still preferred to solve his problems with fisticuffs, including incidents that were relatively recent. Defendant had several violations based on

18

possession of contraband substances, including possession of prison-made alcohol, possession of lighters, and possession of drugs. Defendant had several written disciplinary infractions for failing to comply with officer directives, necessitating deployment of pepper spray.

Defendant was apparently able to maintain his work assignment, even in the Administrative Segregation Unit. He had one memorandum in his record reflecting that he had behaved well enough on his special needs yard and in his restricted classification that he could be housed in a two-person cell; he did not have a history of physical or sexual violence with roommates, either as a perpetrator or a victim, that would compromise safety by assigning him to a two-person cell.

Defendant displayed remarkably little understanding of the consequences of his actions on his victims. He had done little or nothing to gain perspective, to improve himself, to make amends for the wrongs he had done, or even to express minimal understanding of the harms he had caused. Defendant's tearful emotions at the petition hearing were focused largely on the consequences to himself and his family members.

As stated in *Kaulick*: "Penal Code section 1170.126, subdivision (g), provides that a trial court, in exercising its discretion on the issue of dangerousness, may consider the following factors: (1) the petitioner's criminal conviction history; (2) the petitioner's disciplinary record and record of rehabilitation; and (3) '[a]ny other evidence the court, within its discretion, determines to be relevant' to the issue of dangerousness." (*People v. Superior Court (Kaulick)*, *supra*, 215 Cal. App. 4th 1279, 1297.) The record here was

replete with many different kinds of incidents, both in defendant's criminal record and in his prison correctional central file, which indicated that defendant continued to pose an ongoing substantial risk to public safety were he to be released. He had achieved very little in the way of documented efforts at rehabilitation. He continued to minimize his own misconduct and to blame others for his predicament. It simply cannot be said that the trial court's determination that defendant remained an unreasonable risk to public safety was an arbitrary, whimsical or capricious conclusion. (See, e.g., *People v. Nocelotl* (2012) 211 Cal.App.4th 1091, 1097 [trial court's decision not to allow a defendant to withdraw his plea for alleged mistake or misadvice by defense counsel was not an abuse of discretion; the ruling was not "arbitrary, whimsical, or capricious," because the defendant still received a benefit from the plea bargain, regardless of the misadvice, and the defendant failed to allege in his motion to withdraw the plea that he would not have agreed to the bargain in the absence of the mistake].)

We likewise reject defendant's further claims that the trial court denied relief based upon an arbitrary or irrational bias.[3] Defendant claims that "[t]reating eligible defendants differently based simply on the nature of their prior strikes was an arbitrary rationale for denying relief." To the contrary, Penal Code section 1170.126 itself makes

---

[3] Defendant refers to the trial court's discussion of defendant's strike priors as involving robbery and severe trauma to the victims, compared to "property" crimes that did not "hurt people," e.g., stealing from a store or stealing cars, or even residential burglaries, which are "very serious," but which might not involve hurting people. Defendant insists that the court's remarks betrayed a "somewhat shocking[]" misunderstanding, whereas in fact, "[a]ll crime victims are traumatized."

distinctions between defendants based on the "nature of their prior strikes." Defendants with certain prior strikes are statutorily ineligible even to be considered for resentencing. As between three strikes defendants whose prior strike offenses do not automatically render them ineligible for resentencing, the trial court is called upon, in the determination of dangerousness, to make precisely the distinction that defendant now complains of: which such eligible three strikes defendants remain a danger to public safety and which do not?

As defendant states, there is likely some level of trauma or victimization in the commission of almost any strike offense. However, it is no less true that the facts applicable to some criminal offenses will show them to be less traumatizing, and the offender perhaps less dangerous to public safety than the facts in other cases. The court's remarks are reasonably interpreted, not as a blanket determination that all offenders who commit property crimes are less dangerous than other offenders, but as a recognition that the amount of trauma inflicted by offenders on their victims—regardless of or in addition to the type of crime—may be a valid consideration in assessing the continued dangerousness of an eligible three strikes defendant. Indeed, Penal Code section 1170.126, subdivision (g)(1), expressly permits the trial court to consider: "The petitioner's criminal conviction history, *including the type of crimes committed*, [and] the *extent of injury to victims . . . .*" (Italics added.) Defendant's contention that the trial court's consideration of the type of crime he committed, or the trauma he inflicted on victims, is somehow an illegitimate consideration is without merit.

21

Defendant contends that the trial court improperly concluded that he had not done any "programming," when in fact defendant testified that he had been participating in such programs as he could, given his housing status and custody status. Defendant told the court that he had done landscaping and culinary jobs, and any other jobs for which he was eligible. Despite disciplinary incidents on his record, he had not lost any jobs he had had since 2004, and still had "A1-A status." Defendant's central file also contained a chart of defendant's regular work hours for one month, in June of 2010. Defendant contends the trial court "overlooked the proof of programming in the [central] file." Defendant maintains that, although the central file may be "lacking in detail" concerning defendant's participation in prison programs, "[y]et that is not an excuse for the court to totally overlook the scant records of [defendant's] steady programming that [the Department of Corrections and Rehabilitation] included in the [central] file." Defendant has failed to show, however, that the trial court disregarded the evidence that defendant, and his central file, presented. Defendant was fully able to testify that he had worked jobs for which he was eligible, and that he had never lost a job; jobs are lost for "program failure," but defendant maintained his eligibility for the jobs open to someone in close custody.

The court's concern, however, was whether there was anything in defendant's central file showing that he had any positive achievements or referrals. Defendant did complete his GED in his 20's, when he was incarcerated on an earlier offense before the current conviction. Defendant was released after that earlier conviction, and then

22

reincarcerated for the present offense. Defendant is now in his 40's, but had not done any further educational programs. He had never had a job outside of prison. He had remained free from custody at most for a period of 15 or 16 months since the age of 16. Defendant did receive some counseling, but he explained it was for treatment of depression; defendant's counseling had nothing to do with gaining insight into his past or present criminal or other dysfunctional behaviors. Defendant had no entries in his record demonstrating affirmative achievements in education, vocational training, or life skills, during the 13 years of his latest incarceration. He had some periods of time when he avoided disciplinary infractions, and he did some prison jobs within his eligibility. However, he also had a number of disciplinary incidents over the years, which showed that he still resorted to violence to solve his problems. Although defendant claimed that his fights arose from his renunciation of his gang membership, there was nothing in defendant's central file to corroborate this claim. Defendant also still had difficulty conforming his behavior to social requirements, and he still failed to accept responsibility for his actions. The court could not "overlook" evidence of positive achievement and progress that simply wasn't there.

Defendant also contends that the trial court engaged in "unfounded speculation" about defendant's mental or psychological status, without having obtained expert evidence.[4] Defendant concedes, however, that the court was not required to appoint an

---

[4] Defendant points to the court's musings that defendant may have been exposed to drugs in utero, and that he may have had neurological problems at birth. Although defendant claimed at the hearing that he tried to understand the pain he had caused to his

*[footnote continued on next page]*

23

expert to assist it in making the determination of dangerousness.  (See *People v. Stuckey* (2009) 175 Cal.App.4th 898, 917 ["'Of course, the trial court is never obliged to appoint an expert to assist it in making a factual, much less a legal, determination under Evidence Code section 730 unless, as that section provides, "it appears to the court . . . that expert evidence is . . . required"'"].)  The trial court's references to "broken" brains or personalities were simply colloquial expressions of a difference between dysfunctional behaviors and thought processes, rather than ordinary mental mistakes or miscalculations.  The court was not making a medical or psychological diagnosis, as such, but simply noting that defendant's choices of coping mechanisms—denial, minimization, making excuses, resorting to violence, choosing to harm others rather than delay his own desires and gratifications—had not served him well in the past, yet he continued to display the same choices and mechanisms.  Defendant's preferences with respect to problem-solving had hurt people in the past, had persisted into the present, and showed every sign of continuing into the future.

---

*[footnote continued from previous page]*

victims, the court questioned whether defendant truly felt empathy for them, stating that "[s]ometimes people's brains are broken."  Defendant attempted to minimize his conduct, claiming he had made "stupid decisions."  His uncle wrote a letter to the court, stating that defendant had "made mistakes" and "learned from his mistakes."  Defendant's aunt told the court that defendant's crimes were "very hideous, but we all make mistakes," and that defendant was "immature" when he committed his crimes.  The court remarked, however, that "Running a stop sign is a mistake.  I'll even give a first time 18-year-old's petty theft is a mistake.  Pointing weapons at people with other people and Duct taping them in a closet or room and terrifying them so they think they're going to die is not a mistake.  It is a broken personality."

Defendant urges that a preponderance of the evidence "did not prove [he] posed an unreasonable risk to public safety." Our task on review is not to "prove" by a preponderance of the evidence that defendant posed an unreasonable risk to public safety. Rather, the question before us is whether substantial evidence supports the finding made by the trial court. Defendant consistently emphasizes the evidence in the light most favorable to himself to argue that, despite defendant's many rule violations, such misconduct does not logically prove: (1) that defendant would engage in such behavior (such as possession of alcohol or tobacco, which are contraband in the prison setting) outside of prison; or (2) that, even if he did use alcohol or tobacco outside of prison, such conduct would prove risky to public safety; or (3) that defendant committed his crimes influenced by alcohol, tobacco, or any other drugs; or (4) even if defendant did break the law outside prison with respect to use of drugs or alcohol, "that does not logically lead to a conclusion that he posed an unreasonable risk to public safety."

These and other such arguments are beside the point. Defendant's rule violations demonstrate a disregard for conforming his behavior to the social requirements of his environment. Regardless of whether or not there is a "direct correlation" between the subject of some of defendant's prison disciplinary violations and the crimes he committed in the past, he has a demonstrated lack of ability to conform his conduct to society's standards. The evidence was more than ample to support a finding that defendant continued to pose an unreasonable risk to public safety should he be released from prison.

<u>DISPOSITION</u>

The trial court did not abuse its discretion in denying defendant's petition to recall his three strikes sentence.  The order denying defendant's petition is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>McKINSTER</u>

Acting P. J.

We concur:

<u>MILLER</u>

J.

<u>CODRINGTON</u>

J.

26